UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| YRC, Inc.,<br>    *Plaintiff*,<br><br>    v.<br><br>Royal Consumer Products, LLC and Mafcote, Inc.,<br>    *Defendants*. | Civil No. 3:09cv1451 (JBA)<br><br><br><br>August 26, 2011 |

RULING ON MOTIONS FOR SUMMARY JUDGMENT

On September 15, 2009, Plaintiff YRC Inc. (formerly Yellow Roadway Corp.) filed a Complaint against Defendants Mafcote, Inc. and Royal Consumer Products, LLC ("Royal"), seeking to recover $159,225.99 plus interest, costs, and other damages, in past due charges for transportation services under open account and breach of contract theories of liability. Defendants move [Doc. # 42] for summary judgment in their favor on both counts in YRC's Complaint. YRC moves [Doc. # 43] for summary judgment in its favor on its claims against Defendants and on Defendants' counterclaims. For the reasons stated below, Defendants' motion for summary judgment will be denied, YRC's motion for summary judgment on its affirmative claims will be granted, and YRC's motion for summary judgment on Defendants' counterclaims will be granted in part and denied in part.

I.    Relevant Facts

    A.    Agreement for Transportation

On March 22, 2000, Mafcote and Yellow Freight System, Inc. ("Yellow") entered into an Agreement for Transportation ("Agreement") with an effective date of February 1, 2000, under which Yellow, as the "carrier," agreed to transport goods for Mafcote, the "shipper," and its affiliated companies. (Agreement, Ex. A to Defs.' Loc. R. 56(a)1 Stmt.) Royal is an

affiliate and wholly owned subsidiary of Mafcote. (Schulman Aff., Ex. B to Pl.'s Loc. R. 56(a)1 Stmt. ¶ 3.) As part of the Agreement, Yellow agreed to "promptly and efficiently receive, transport, and deliver safely" Mafcote's goods and Mafcote agreed to pay Yellow "within thirty (30) days of the date of the bill for prepaid moves and thirty (30) days from the date of delivery for collect moves." (Agreement ¶¶ 4, 6.) The Agreement provides with respect to loss or damage to shipments that Yellow "assumes the liability of an interstate motor common carrier in accordance with Section 14706 of Title 49 of the United States Code" and that claims against Yellow "for loss of or damage to commodities shall be governed by 49 C.F.R., Part 370." (*Id.* ¶ 7.)

Under the Agreement, "any bill of lading used for the transportation of commodities contemplated in this Agreement shall be deemed to read as the Uniform Straight Bill of Lading as provided in the [National Motor Freight Classification] as of the date the commodities are tendered to [Yellow]." (*Id.* ¶ 18.) The Uniform Straight Bill of Lading Terms and Conditions provide: "Claims for loss or damage must be filed within nine months after the delivery of the property . . . , except that claims for failure to make delivery must be filed within nine months after a reasonable time for delivery has elapsed." (Uniform Straight Bill of Lading, Ex. C to Pl.'s 56(a)1 Stmt. § 3(b).) The Terms and Conditions further state that "[w]here claims are not filed or suits are not instituted thereon in accordance, no carrier shall be liable and such claims will not be paid." (*Id.* § 3(c).)

B.     Merger and Assignments

The Agreement provides that "[t]he rights and obligations hereunder are personal to each party to this Agreement, and this Agreement shall not be assignable or otherwise transferable by either party, in whole or in part, without the written consent of the other

2

party." (Agreement ¶ 19.)  On January 25, 2002, Yellow Freight System, Inc. changed its name to Yellow Transportation, Inc.  (Yellow Freight System Certificate of Amendment, Ex. B to Defs.' 56(a)1 Stmt.)  Then, on October 1, 2008, Yellow Transportation, Inc. merged with Roadway Express, Inc., leaving Roadway Express, Inc. as the surviving company, and changing its name to Yellow Roadway Corp.  (Agreement and Plan of Merger, Ex. D to Defs.' 56(a)1 Stmt.)  Yellow Roadway Corp. changed its name to YRC, Inc.—in whose name this suit is brought—on October 10, 2008.  (Yellow Roadway Certificate of Amendment, Ex. E to Defs.' 56(a)1 Stmt.)   The Agreement and Plan of Merger between Yellow Transportation, Inc. and Roadway Express, Inc. provided that "the assets and liabilities of Yellow shall be transferred to Roadway at the amount at which they shall at the time be carried on the books of Yellow, subject to such adjustments, if any, as may be necessary to conform to Roadway's accounting procedures."  (*Id.* ¶ 6.)

    C.    YRC's Claims

YRC's Statement of Account for Royal Consumer Products ("Statement") as of November 20, 2008, lists a total of 671 outstanding (in whole or in part) freight bills totaling $159,225.99 owed by Royal for transportation services provided. (Woody Aff., Ex. D to Pl.'s 56(a)1 Stmt. ¶¶ 4–9; Statement of Account, Ex. A to Woody Aff.)  The bill date for the charges listed on the Statement range from April 9, 2007 to October 1, 2008; these charges therefore predate the merger between Yellow Transportation, Inc. and Roadway Express, Inc. and the formation of YRC.  (*See* Agreement and Plan of Merger; Yellow Roadway Certificate of Amendment.)  According to Steven Schulman, President of Mafcote and Royal, each of the invoices reflected in the Statement was sent to Royal by Yellow Transportation,

3

Inc. and bore Yellow Transportation, Inc.'s name. (Schulman Aff. ¶ 11.) Schulman also avers:

> At no time did Yellow Freight Systems, Inc., Yellow Transportation, Inc., Roadway Express, Inc., YRC, Inc., or any other entity for that matter, ask for the consent of Mafcote or Royal concerning a transfer of rights under the contract with Yellow Freight System, Inc. that was formed in February 2000, and I can categorically state that no such consent was given by Mafcote or Royal.

(*Id.* ¶ 10.)

### D. Defendants' Counterclaims

In their affirmative defenses and counterclaims, Defendants allege that "[o]n many occasions, Yellow delivered Royal's shipments with loss and/or damage to goods and/or late delivery," for which "Royal provided written claims for loss and damage to Yellow." (Answer [Doc. # 35] at 10.) Defendants claim that they have suffered no less than $657,000.00 in loss and damages as a result of Yellow's breaches of the Agreement. (*Id.*) According to YRC's summary of the documentation relevant to Defendants' loss and damage claims provided by Defendants during discovery, Defendants have submitted 1,506 claims totaling $631,806.86. (Blaylock Aff., Ex. G to Pl.'s 56(a)1 Stmt; Ex. 1 to Blaylock Aff.; Defs.' Loc. R. 56(a)2 Stmt. ¶¶ 25–26.) Only 210 claims of loss or damage, totaling $62,918.13, were submitted by Defendants within nine months of receiving those shipments. (*Id.*)

Trevor Blaylock, YRC's Legal Claims Examiner, states in his affidavit that the shipments at issue in Defendants' counterclaims were shipped under "said to contain" ("STC") and/or "shipper load and count" ("SLC") terms, which means that they were loaded onto trailers without assistance from the carrier, who therefore could not have verified the

4

contents and conditions of this already–packaged cargo at the shipment's origin. (Blaylock Aff. ¶ 8.) Jerry Blake, a member of Mafcote's warehouse personnel in Louisville, Kentucky, corroborated these shipment conditions and testified during his deposition that STC means that the shipper confirms to the best of its knowledge that it has accurately represented what is in the pallet being shipped and that unless a carrier like YRC breaks down a pallet and that he didn't "really see how they" could confirm what was inside the shrink–wrapped pallets. (Blake Dep., Ex. H to Pl.'s 56(a)1 Stmt. at 78:17–80:3.) Blaylock's affidavit states that the documents produced by Defendants during discovery reveal that "the majority of the shipments at issue in Mafcote's and Royal's counterclaims . . . arrived at destination with the original shrink wrap intact," and that Defendants' discovery documents "failed to provide any support for [their] allegations that cartons containing particular products were missing." (Blaylock Aff. ¶¶ 9–10.)

William Bernstein, Chief Financial Officer for Mafcote and its affiliates, testified during his deposition, however, that the shrink wrap used on pallets shipped by Defendants is "nothing but clearish Saran Wrap" which allows the truck driver to "easily see the number of cartons." (Bernstein Dep., Ex. D to Defs.' Loc. R. 56(a)2 Stmt. at 52:17–56:4.) Bernstein also testified that it is up to the driver to validate what is passed to him and that it is a "pretty easy function" for the driver to verify the number of cartons contained in each pallet. (*Id.*) He continued that it is industry standard "to count the number of cartons on the pallet" and that it would be "highly improbable" for there to have been "voids" within the pallet. (*Id.*)

II.     Discussion[1]

YRC argues that it is entitled to summary judgment in its favor on its claims against Defendants because under the Agreement, it is entitled to recover the freight unpaid freight charges owed by Defendants regardless of any alleged loss or damage claims by Defendants. YRC also argues that it is entitled to summary judgment on Defendants' loss and damage counterclaims because most of these loss and damage claims were untimely filed and because, in any event, Defendants cannot establish a prima facie loss or damage case on any of its claims. Defendants argue that they are entitled to summary judgment in their favor on YRC's complaint because Section 19 of the Agreement, prohibiting transfers and assignments of rights, bars YRC's claims.

    A.     Section 19 and Defendants' Motion for Summary Judgment

Defendants argue that Section 19 of the Agreement provides that the rights and obligations thereunder "shall not be assignable or otherwise transferable by either party, in whole or in part, without the written consent of the other party," and that the merger of Yellow Transportation and Roadway Express was a transfer of rights to the surviving corporation, Yellow Roadway Corp., which changed its name to YRC, and because Defendants did not consent in writing to that transfer of rights, YRC cannot maintain this

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

action for freight charges incurred prior to the merger. (Defs.' Mem. Supp. [Doc. # 42–7] at 3–4.) YRC argues in response that the merger vested contractual rights in the surviving entity without an assignment or transfer actually occurring, thus Section 19 does not interfere with its ability to recover its claims. (Pl.'s Opp'n at 1–2.) YRC also argues that even if the Court were to find that Section 19 barred its action against Defendants for breach of the Agreement, its claim for Open Account is unaffected by Section 19 because that claim does not seek performance under the Agreement. (*Id.* at 9.)

Section 19 of the Agreement reads: "[t]he rights and obligations hereunder are personal to each party to this Agreement, and this Agreement shall not be assignable or otherwise transferable by either party, in whole or in part, without the written consent of the other party." (Agreement ¶ 19.) The Merger Agreement, governed by Delaware law, provides:

> As of the Effective Time, the assets and liabilities of Yellow shall be transferred to Roadway at the amount at which they shall at that time be carried on the books of Yellow, subject to such adjustments, if any, as may be necessary to conform to Roadway's accounting procedures. In addition, all of the rights, privileges, immunities, and franchises of Yellow and all property (real, personal, and mixed) and debts due to Yellow shall be vested, for all purposes and in all respects, in Roadway.

(Agreement and Plan of Merger ¶ 6.)

In arguing that the transfers pursuant to the Merger Agreement are barred by Section 19 without written consent, Defendants rely in large part on *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090, 1094–96 (6th Cir. 1979), which held that patent licenses did not pass from licensee Permaglass, Inc. to the surviving corporation in a merger between Permaglass and Guardian Industries, Corp., executed pursuant to Ohio and Delaware

7

merger statutes, because the patent–licensing agreement between Permaglass and PPG Industries, Inc. contained a non–assignment clause, which "show[ed] an intent that the licenses held by Permaglass in the eleven patents in suit not be transferable" and prohibited the transfer of rights that was to have occurred pursuant to the merger agreement. *Id.* at 1095–97.

In *Nicolas M. Salgo Assoc. v. Continental Ill. Prop.*, 532 F. Supp. 279, 282–83 (D.D.C. 1981), also relied on by Defendants, the district court followed the approach espoused in *PPG* and found that although a merger by operation of law constitutes a transfer of interests, a non–assignment clause operates to bar any such transfer. In *Salgo*, the plaintiff and defendant had formed a partnership pursuant to an agreement with a clause barring transfers of partnership interest and the defendant subsequently merged into another corporation. *Id.* at 280–81. Judge Flannery rejected the alternate approach—in which a merger by operation of law is considered merely a change in legal form of ownership and thus not barred by a non–assignment clause—because the contract at issue contained exceptions to the non–assignment clause which did not include merger, because the parties involved were "extremely experienced business entities and should be savvy to the importance of accurately drafting contracts," and because the merger would have otherwise forced the plaintiff to accept a new partner without its consent. *Id.* at 283. *Parks v. CAI Wireless Systems, Inc.*, 85 F. Supp. 2d 549, 554–55 (D. Md. 2000) also followed this approach, finding that a merger by operation of law resulted in a transfer of partnership interest between corporations and thus constituted an assignment in violation of a non–assignment clause.

YRC relies on several cases concerning the transfer by merger of real estate leases and insurance policies in support of its position that a merger simply vests contractual rights in the surviving entity without an assignment or transfer, and that Section 19 therefore does not bar its claims. It attempts to distinguish *PPG*, *Salgo*, and *Parks* primarily on the ground that they concern patent licenses and partnership interests, which are contractual rights that are more personal than the transportation and payment rights under the Agreement here. (Pl.'s Opp'n at 5–7.) In contrast to the *PPG* line of cases, the cases relied upon by YRC adopt the approach that in the event of a merger by operation of law, a transfer of rights and obligations does not occur, but instead "the surviving corporation simply stands in the same position as that occupied by the merged corporation prior to the merger." *St. Paul Fire & Marine Ins. Co. v. Emp'rs Mut. Liab. Ins. Co. of Wisc.*, 509 F. Supp. 750, 752–53 (E.D. Penn. 1981). They focus in large part on the fact that the relevant mergers did not involve any increased risk or prejudice to the other parties who sought to invoke non–assignment clauses to bar those mergers. In *Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co.*, 535 F.2d 287, 292–93 (5th Cir. 1976), the Fifth Circuit refused to apply a non–assignment clause "ritualistically and mechanically" to forfeit insurance coverage where a merger by operation of law transferred a Fireman's Fund insurance policy to the surviving entity but "caused no increase in the risks or hazards incurred by Fireman's Fund." Similarly, the Supreme Court of Missouri held in *Standard Operations, Inc. v. Montague*, 758 S.W.2d 442, 443 (Mo. 1988), that a merger by operation of law was not an assignment of a lease in violation of a non–assignment clause where prohibiting the assignment would confer on the lessor an advantage over the lessee, the surviving entity in the merger, because the lessor would have been able to hold the merged lessee to the lease "so as to have the benefit of her

9

initial bargain, or could use the threat of termination to negotiate with the successor or outsiders for additional remuneration."

The nature of Defendants' and YRC's interests in the Agreement here more closely resemble the insurance and leasehold interests in *Imperial Enterprises* and *Montague* than the personal patent and partnership rights and obligations in *PPG*, *Salgo*, and *Parks*. The particular right under the Agreement at issue here—YRC's right to payment for transportation services already provided to Defendants—is not as "personal" a right as a patent license or partnership agreement, where allowing a transfer of that right to a new entity would force Defendants to accept a close business relationship with a party with whom they did not negotiate. *See PPG*, 597 F.2d at 1097; *Salgo*, 532 F. Supp. at 283. Instead, allowing Defendants to avoid paying YRC for services already rendered to which Defendants did not object at the time they were performed, would allow Defendants to take advantage of the benefit of their initial bargain while avoiding the incurred obligations to Yellow's successor. *See Montague*, 758 S.W.2d at 443. The nature of the Agreement between Yellow and Defendants and the obligations created therein resemble the insurance and lease agreements in *Fireman's Fund* and *Montague*, more than the ongoing personalized relationships in *PPG* and *Salgo*. Defendants do not dispute that they incurred the $159,225.99 total in charges under the Agreement,[2] nor do they argue that YRC's assumption of the right to payment of those charges would alter an ongoing relationship between the parties. Further, none of the language in the Agreement suggests an intention or reason to give Defendants control over the other party's corporate form and Section 19 should not

---

[2] Defendants' counsel agreed at oral argument that in the event that the merger did not breach Section 19 of the Agreement, Defendants would owe YRC the full $159,225.99.

10

serve to provide Defendants with a windfall by barring YRC's ability to recover for services already provided to and accepted by Defendants under the Agreement. Defendants' motion for summary judgment is therefore denied.

B.   YRC's Claims

YRC argues that summary judgment in its favor is appropriate on its claims for past due freight shipment charges for the 671 shipments transported and invoiced to Defendants between April 2007 and October 2008 because it is entitled to payment for those shipments under the Agreement regardless of Defendants' set–off claims. (Pl.'s Mem. Supp. [Doc. # 45] at 5–7.)

Under the Agreement, Mafcote agreed to pay invoices "within thirty (30) days of the date of the bill for prepaid moves and thirty (30) days from the date of delivery for collect moves." (Agreement ¶ 6.) Yellow Transportation provided transportation services in the form of 671 shipments for Defendants between April 2007 and October 2008 and invoiced Royal for $159,225.99 for these shipments. (Woody Aff. ¶¶ 4–9; Ex. A to Woody Aff.) Defendants admit that they have refused to pay these invoices, but claim that their refusal stems from YRC's failure to honor their loss and damage claims. (Defs.' 56(a)2 Stmt. ¶ 18.)

In the Second Circuit, where one party to a contract presents claims for unpaid freight charges and another party claims loss or damage to the shipped goods, although the loss or damage claims may be viable counterclaims, they are "legally irrelevant" to the claims for unpaid freight charges. *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 282 (2d Cir. 1986). Indeed Mafcote's liability to Yellow for freight charges and Yellow's liability to Mafcote for loss or damage claims are governed by separate provisions of the Agreement. (Agreement ¶¶ 4, 7.) Section 4 of the Agreement, concerning Mafcote's

11

payments to Yellow for transportation services, does not confer on Mafcote the right to take a set–off for lost or damaged goods. (*Id.* ¶ 4.) Defendants do not dispute the $159,225.99 in total invoices or that they have not paid that total. They argue in their Opposition only that Yellow, rather than YRC, invoiced them for these shipments and that because Section 19 bars the transfer of this right to payment, YRC is not entitled to payment. However, as discussed above, Section 19 does not bar YRC's right to payment. Because it is undisputed that Defendants have not made payment on the $159,225.99 in outstanding invoices, YRC's motion for summary judgment on its claims to recover past due freight shipment charges is therefore granted.

    C.    Defendants' Counterclaims

        1.    Timeliness

YRC argues that it is entitled to summary judgment on Defendants' loss and damage counterclaims with respect to 1,296 of 1,506 shipments because Defendants filed loss and damage claims for only 210 of those shipments within the ninth–month claim–filing period set forth in the Agreement. (Pl.'s Mem. Supp. at 11.) Defendants respond that because their counterclaims arise from the same contract as do YRC's claims, the counterclaims sound in recoupment and are not time–barred. (Defs.' Opp'n at 6.)

The Agreement provides that "any bill of lading used for the transportation of commodities contemplated under this Agreement shall be deemed to read as the Uniform Straight Bill of Lading as provided in the [National Motor Freight Classification] as of the date the commodities are tendered to [Yellow]." (Agreement ¶ 18.) The Uniform Straight Bill of Lading Terms and Conditions specify that "[c]laims for loss or damage must be filed within nine months after the delivery of the property." (Uniform Straight Bill of Lading §

3(b).) The Terms and Conditions further state that "[w]here claims are not filed or suits are not instituted thereon in accordance, no carrier shall be liable and such claims will not be paid." (*Id.* § 3(c).) Of Defendants' 1,506 total claims for loss and damage, it is undisputed that 210 claims totaling $62,918.13 were filed within nine months of delivery. (Ex. 1 to Blaylock Aff.; Defs.' 56(a)2 Stmt. ¶¶ 25–26.)[3]

A recoupment defense or counterclaim is brought to reduce a plaintiff's recovery by "all just allowances or demands accruing to the defendant with respect to the same contract or transaction." *Distrib. Servs., Ltd. v. Eddie Parker Interests, Inc.*, 897 F.2d 811, 812–13 (5th Cir. 1990). It is a "purely defensive procedure" aimed at a plaintiff's claim rather than an affirmative cause of action. *Id.* "Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely." *Reiter v. Cooper*, 507 U.S. 258, 264 (1993). Nonetheless, while recoupment claims are not barred by a statute of limitations, they can nonetheless be barred by temporal limitations in a contract that establish a time period in which a shipper must provide notice to the carrier as a "condition precedent" to maintaining a claim for loss or damage. *Consol. Rail Corp. v. Primary Indus. Corp.*, 868 F. Supp. 566, 577 (S.D.N.Y. 1994) (provision in uniform bill of lading that read "[a]s a condition precedent to recovery, claims must be filed . . . within nine months after delivery of the property. . . . Where the claims are not filed . . . in accordance with [the nine month requirement], no carrier hereunder shall be liable, and such claims will not be paid" meant that the shipper "ha[d] no cause of action to bring" if it failed to give proper notice within the nine–month period).

---

[3] Defendants' counsel conceded at oral argument that only 210 of the loss and damage claims were filed within the nine–month period.

Although the Uniform Straight Bill of Lading Terms and Conditions applicable to the Agreement do not use the phrase "condition precedent" in describing the nine–month filing period, they expressly specify that "[w]here [loss or damage] claims are not filed or suits are not instituted thereon in accordance with the [nine–month period], no carrier shall be liable, and such claims will not be paid." (Uniform Straight Bill of Lading Terms and Conditions ¶ 3(c).) This language is sufficiently similar to that used in the bill of lading in *Consolidated Rail Corporation* to establish a condition precedent to any loss or damage claim, and not a statute of limitations. Under this provision of the Terms and Conditions, YRC is not liable for any claims filed outside of the nine–month filing period. Because this is a condition precedent rather than a statute of limitations, *Reiter* does not apply, and the nine–month period in the Uniform Straight Bill of Lading bars Defendants' counterclaims based on all shipments other than the 210 filed within that period.

### 2. Prima Facie Case

YRC argues that it is entitled to summary judgment on "most, if not all, of the claims that form the basis of the counterclaims" because Defendants cannot establish a prima facie cargo loss or damage case with respect to these claims. (Pl.'s Mem. Supp. at 14.) Defendants respond that although it will be their burden to establish a prima facie loss or damage case, YRC cannot meet its burden at the summary judgment stage to demonstrate that Defendants will be unable to establish their prima facie case. (Defs.' Opp'n at 9–10.)

"To make a prima facie case under the Carmack Amendment, a [shipper] must show 1) delivery to the carrier in good condition; 2) arrival in damaged condition; and 3) the amount of damages caused by the loss." *Project Hope v. M/V IBN SNA*, 250 F.3d 67, 74 n.6 (2d Cir. 2001). "[A] shipper's burden of proving that the goods were delivered to the carrier

14

in good condition may be satisfied by the proffer of a clean bill of lading for the shipment, provided that the cargo was packaged in a way that permitted its inspection by the carrier." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004). "However, where the contents of a shipment are not visible or open for inspection, as may be the case when cargo is transferred to the carrier in a sealed container, a clean bill of lading is not sufficient to establish delivery of the goods in good condition." *Id.* In such an instance, the shipper must instead "present additional evidence, either direct or circumstantial, in order to establish the initial contents and condition of the cargo." *Id.* at 84.

YRC argues that the documents provided by Defendants during discovery show that "the majority, if not all of the shipments at issue" were packaged and loaded by Defendants, and thus YRC was unable to inspect the cargo. (Pl.'s Mem. Supp. at 16–17.) YRC further argues that because Defendants therefore cannot demonstrate the condition of the cargo prior to transportation, they cannot establish that the cargo arrived at its destination in worse condition than it was shipped. (*Id.* at 18–19.) According to William Bernstein, however, Royal and Mafcote ship their cargo on pallets wrapped in clear shrink–wrap, permitting the carrier to verify the number of cartons being shipped. (Bernstein Dep. at 52:17–56:4.) In addition, despite claiming that most, if not all the shipments were shipped STC and/or SLC, meaning that they were loaded by Defendants without YRC's inspection, YRC cites to nothing in the record other than Blaylock's affidavit that establishes which shipments were shipped STC and/or SLC.

YRC does not meet its burden on summary judgment of showing that Defendants will be unable to show, using a clean bill of lading, that the goods were delivered to YRC in

15

good condition. YRC has not established beyond dispute that the cargo was packaged in such a way that inspection was not permitted; such a determination will depend on the color and opacity of the shrink–wrap surrounding the pallets, facts which are disputed in the record. YRC similarly has not established which shipments were shipped without YRC's inspection and is therefore not entitled to summary judgment on Defendants' timely counterclaims.

III.   Conclusion

For the reasons stated above, Defendants' motion [Doc. # 42] for summary judgment is DENIED. Plaintiff's motion [Doc. # 43] for summary judgment is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of August, 2011.